UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

FRANCISCO SILVA,

    Petitioner,

vs.

ROBERT LeGRAND, *et al.*,

    Respondents.

_____/

3:14-cv-00342-RCJ-WGC

ORDER

Introduction

    This action is a petition for writ of habeas corpus by Francisco Silva, a Nevada prisoner. The action is before the Court with respect to the merits of Silva's amended habeas petition. The Court will deny Silva's petition.

Substitution of Respondent

    Silva is incarcerated at Nevada's Lovelock Correctional Center (LCC). Renee Baker is the warden of LCC. Therefore, pursuant to Federal Rule of Civil Procedure 25(d), Renee Baker will be substituted for Robert LeGrand, as the respondent warden in this action.

Background

    Silva was convicted on March 23, 2009, following a jury trial in Nevada's Eighth Judicial District Court, in Clark County, of eight counts of lewdness with a child under the age of fourteen, and one count of sexual assault with a minor under fourteen years of age. *See* Judgment of

Conviction, Exhibit 26. (The exhibits referred to in this order were filed by Silva, and are located in the record at ECF Nos. 20-27.) Silva was sentenced on the lewdness convictions to eight concurrent sentences of ten years to life in prison, and on the sexual assault conviction to a concurrent sentence of twenty years to life in prison. *See id.* Silva's convictions result from his sexual abuse of his common-law wife's sister, AS, who was between ten and twelve years old when Silva sexually abused her.

Silva was first tried between July 9 and 13, 2007. *See* Trial Transcripts, Exhibits 10, 11, 13 and 14 (ECF Nos. 20-10, 21, 21-1, 21-2, 22-1, 22-2 and 22-4). At the conclusion of that trial, the jury found Silva guilty of all counts: eight counts of lewdness with a child under the age of fourteen, and one count of sexual assault with a minor under fourteen years of age. *See* Verdict, Exhibit 16 (ECF No. 22-5). Silva moved for a new trial, on the ground that the prosecution had made an improper propensity argument in its final argument to the jury. *See* Motion for New Trial, Exhibit 18 (ECF No. 22-7). The trial court granted that motion, and set a date for a new trial. *See* Order Granting New Trial, Exhibit 19 (ECF No. 22-8).

Silva's second trial began on January 5, 2009. *See* Trial Transcript, January 5, 2009, Exhibit 20 (ECF No. 23).

AS testified first. She testified that she was born in February 1992; she was twelve years old in November 2004, when the event that led to Silva's arrest occurred. *See* Testimony of AS, Trial Transcript, January 5, 2009, Exhibit 20, p. 40 (ECF No. 23, p. 12). AS testified that on an early morning in November 2004, she woke up in her bed to find Silva fondling her breasts. *See id.* at 43-44 (ECF No. 23, p. 13). She testified that when this happened, Silva was sitting on her bed, and then he got under the covers with her. *See id.* at 44. At the time, AS' older brother, Jorge, was sleeping on a mattress on the floor in the same room; he did not usually sleep there, but slept there instead of in the living room on that occasion, because he was ill. *See id.* at 42-43. AS testified that when Silva was in her bed, Jorge woke up and raised and then lowered his head, and then Silva got up and left the room. *See id.* at 45-46 (ECF No. 23, pp. 13-14). AS testified that Jorge asked her who was

2

1  there, but she did not tell him at that time. *See id.* at 46-47 (ECF No. 23, p. 14). AS testified that
2  she did not tell her brother who it was because she was afraid Jorge would tell their father. *See id.* at
3  47. AS testified that in the morning, Jorge and her mother spoke with her about what happened and
4  she told them that it was Silva who had been in her bed. *See id.* at 47-49. AS testified that her
5  mother then called the police, the police came to the house, and she spoke to them about what had
6  happened. *See id.* at 48-49. AS testified that a few days later her mother took her to a hospital. *See*
7  *id.* at 51-52 (ECF No. 23, p. 15). AS testified that she had not taken Silva's cell phone on the night
8  of the November 2004 incident, and that, when Silva was in her room, he did not say anything about
9  his cell phone, and, to her knowledge, he did not find his cell phone in her room. *See id.* at 59-60
10 (ECF No. 23, p. 17); *see also id.* at 65-66 (ECF No. 23, pp. 18-19) (testifying on cross-examination
11 that Silva was lying when he claimed that he woke her up asking about his cell phone). AS testified
12 that Silva had touched her inappropriately on other occasions as well. *See id.* at 53 (ECF No. 23,
13 p. 15). AS testified about those other occasions as follows:

> Q.  What was the first -- or what was the first thing you ever remember happening? What kind of touching?
>
> A.  In the other occasions he touched my breasts. He touched my vagina, and he put his penis in my vagina.
>
> Q.  Do you remember when he put his penis in your vagina -- how did that feel?
>
> A.  It hurt.
>
> *   *   *
>
> Q.  Was that the first time you remember anything happening to you related to the defendant?
>
> A.  Yes.
>
> Q.  So if that was the first time -- you said that there were other times that something happened where he touched you one way or the other; is that correct?
>
> A.  Yes.
>
> Q.  Do you know about how many times he touched you between that first time and the time that you talked to the police?

        A.     Five times in the past he touched my vagina with his penis, and the other times he just touched my breasts.

        Q.     How many times were those?

        A.     Nine times.

        Q.     When he touched your breasts, did he touch just your breasts?

        A.     Yes.

        Q.     What did he touch your breasts with?

        A.     With his hands.

        Q.     So he touched your breasts nine times with his hands, and he's touched your vagina five times with his penis?

        A.     Yes.

*Id.* at 53-55 (ECF No. 23, pp. 15-16); *see also id.* at 68, 90-92 (ECF No. 23, pp. 19, 25).

        AS' brother, Jorge Soza, also testified. Jorge testified that early that November, 2004, morning, he was sleeping in the same room as AS, and he woke up and saw Silva in AS's bed, under the covers. *See* Testimony of Jorge Soza, Trial Transcript, January 6, 2009, Exhibit 21, p. 24 (ECF No. 23-1, p. 8). Jorge saw movement in the bed. *See id.* Jorge testified that Silva then got out of the bed and left the room. *See id.* at 25. Jorge testified that he did not hear Silva ask AS about his cell phone, and he did not see Silva look under the bed or anyplace else in the room. *See id.* at 26-27 (ECF No. 23-1, p. 9). Jorge testified that the next morning he told his mother what he saw, and he and his mother spoke with AS about what had happened. *See id.* at 28-29. AS became upset, and began crying, and told them what Silva had done. *See id.* at 29. Jorge testified that AS said that Silva had touched her breasts. *See id.*

        Jorge testified that some six months later Silva approached him and spoke to him about this matter. *See id.* at 33-34 (ECF No. 23-1, pp. 10-11). Jorge testified that Silva told him "[n]ot to come to court and not to tell what happened," and "[t]o say that [he] made it up." *See id.* at 34 (ECF No. 23-1, p. 11). Jorge testified that Silva told him "[t]o help him, and if [he] ever had a problem, [Silva] would help him." *See id.* Jorge also testified that he received a letter from Silva, in which

Silva asked "for us not to come back to court and to say that we had made it up." *See id.* at 34-38 (ECF No. 23-1, pp. 11-12).

Toni Drew, a nurse, testified that she took part in interviewing AS when AS was brought into a hospital on November 29, 2004. *See* Testimony of Toni Drew, Trial Transcript, January 6, 2009, Exhibit 21, pp. 62-67 (ECF No. 23-1, pp. 18-19). Drew testified that AS told them that she had been touched on about ten occasions in a manner that was possibly sexual assault. *See id.* at 70-71, 74 (ECF No. 23-1, pp. 20-21). Drew testified that AS described being touched, on numerous occasions, in her vaginal area, by a man's penis, and AS said it hurt. *See id.* at 71-73. AS also said she had been touched on her breasts by a person's hands. *See id.* at 73.

Dr. Neha Mehta, a pediatrician, also testified about the interview of AS, and her examination of her, at the hospital on November 29, 2004. AS told Dr. Mehta that a man had put his mouth and his hands on her breasts, and had placed his penis in the area of her vagina, and that had been painful. *See* Testimony of Neha Mehta, Trial Transcript, January 6, 2009, Exhibit 21, p. 92 (ECF No. 23-1, p. 25). Dr. Mehta testified that AS said that such incidents had happened with this person about ten times. *See id.* The results of Dr. Mehta's physical examination of AS were consistent with a person AS' age who had been subjected to sexual intercourse. *See id.* at 97-98 (ECF No. 23-1, pp. 26-27). However, at the same time, the results of the physical examination were inconclusive as to whether in fact that had happened. *See id.* at 100, 103-04 (ECF No. 23-1, pp. 27-28).

Las Vegas Municipal Police Officer Carlos Luna then testified. Luna testified that he responded to the residence where AS lived on the morning of November 11, 2004. He testified, as follows, that he spoke with AS, who was upset:

> Q. Without telling us why she said she was upset, what information did she relate to you?
>
> A. I began to question -- conduct a preliminary investigation. So I asked her -- I said -- I told her, I said, tell me what happened. And she finally said she was asleep in her bed and her -- someone came into the room who she later identified as her brother-in-law, which is the defendant. And she said that he had crawled into the bed with her and began to fondle her breast and asked her to have sex with her. She got upset.

5

> The brother, who sleeps in the same room but a different bed, kind of hears the commotion so he wakes up. He sees what's going on. The gentleman gets up, goes to the restroom, and then he goes to the bedroom. So she's just -- that's as far as what she said that, you know -- that's what happened, so ...
>
> Q.   That night?
>
> A.   That night.
>
> Q.   Did she relay anything else that had happened?
>
> A.   When I talked to her, she had said that -- I asked her -- I said, Was there any sexual intercourse? Did he attempt to do any penetration on you? Did he do anything like that? She says, no. It was just grabbed my breasts and he was asking me to have sex with him. She says but he has, you know, had sex with me prior, before. So I'm like, oh, really, and then I said -- I didn't ask her how many times, but she said she had had previous intercourse with him before.

Testimony of Carlos Luna, Trial Transcript, January 6, 2009, Exhibit 21, pp. 109-10 (ECF No. 23-1, pp. 29-30).

The next witness to testify was Vicente Ramirez, a detective with the Las Vegas Metropolitan Police Department, who also responded to the residence where AS lived on the morning of November 11, 2004. Detective Ramirez testified that he interviewed AS, and his testimony in that regard included the following:

> Q.   [...] What does she tell you?
>
> A.   Basically, she tells me that her brother-in-law this morning -- and it was roughly about 3:00 that she can remember -- had gone into her bedroom, had gotten underneath the covers and had started to fondle her breasts over her brassiere.
>
> Q.   Okay. So fondles her breasts underneath her nightgown or whatever it was?
>
> A.   She had described it just like a large T-shirt.
>
> Q.   Okay. So that's what she tells you happens then. Did she talk about any intercourse or anything at that time?
>
> A.   As the interview continued, she did talk about an incident that happened about a year and a half ago that he had forced her to have sex with him.
>
> Q.   And she was how old at this time?
>
> A.   I want to say she was 12 years old.

6

Testimony of Vicente Ramirez, Trial Transcript, January 6, 2009, Exhibit 21, p. 129 (ECF No. 23-1, p. 34); *see also id.* at 132-34 (ECF No. 23-1, pp. 35-36). Detective Ramirez testified that he also interviewed Silva, on the same day, at the police station. Detective Ramirez testified as follows about what Silva said had happened:

> Q. What else did he tell you?
>
> A. He told me that that morning he had gotten up roughly about 3:00. He needed to charge his cell phone. He saw it wasn't in his room, so that he had gone into [AS's] bedroom, and that he shook her shoulder to wake her up to ask her where his phone was. He said she didn't wake up, and that he believes that her brother woke up and saw him. That he then just went to the bathroom. After that, he went to his room, got ready, and left for work.

*Id.* at 136-37 (ECF No. 23-1, p. 36); *see also id.* at 141-45 (ECF No. 23-1, pp. 37-38).

Silva testified in his defense at his trial. Silva admitted that he went into AS' room in the early morning of November 11, 2004, but he testified that he did so to look for his cell phone, and he found it there, under or beside AS' bed. *See* Testimony of Francisco Silva, Trial Transcript, January 7, 2009, Exhibit 25, pp. 26-28, 57 (ECF No. 24, pp. 9, 16). Silva denied that he got under the covers with AS, that he touched AS' breasts on that occasion, that he ever touched her breasts at any other time, and that he ever had sexual intercourse with her. *See id.* at 28, 31, 33-34, 57-59 (ECF No. 24, pp. 9-11, 16-17). Silva also denied attempting to dissuade Jorge from testifying. *See id.* at 33, 51-54, 96-97 (ECF No. 24, pp. 10, 15-16, 26).

The jury found Silva guilty of all counts. *See* Trial Transcript, January 8, 2009, Exhibit 26, pp. 51-54 (ECF No. 24-1, pp. 15-16); Verdict, Exhibit 27 (ECF No. 24-2). The judgment of conviction was entered on March 23, 2009; Silva was sentenced on the eight lewdness convictions to eight concurrent sentences of ten years to life in prison, and on the sexual assault conviction to a concurrent sentence of twenty years to life in prison. *See* Judgment of Conviction, Exhibit 30 (ECF No. 24-5).

Silva appealed, and the Nevada Supreme Court affirmed the judgment of conviction on May 10, 2010. *See* Order of Affirmance, Exhibit 37 (ECF No. 25-2).

Silva filed a petition for writ of habeas corpus in state court on June 2, 2011. *See* Petition for Writ of Habeas Corpus, Exhbit 39 (ECF Nos. 26, 26-1, 26-2). The state district court denied the petition, in a written order, on September 6, 2011. *See* Findings of Fact, Conclusions of Law and Order, Exhibit 41 (ECF No. 27-1). Silva appealed, and the Nevada Supreme Court reversed and remanded, ruling that the state district court had erred in not appointing counsel for Silva. *See* Order of Reversal and Remand, Exhibit 44 (ECF No. 27-4). On remand, counsel was appointed, and, with counsel, Silva filed a supplement to his state-court habeas petition. *See* Supplement to Petition for Writ of Habeas Corpus, Exhibit 46 (ECF No. 27-6). The state district court again denied relief, in a written order, on May 3, 2013. *See* Findings of Fact, Conclusions of Law and Order, Exhibit 51 (ECF No. 27-11). Silva appealed, and the Nevada Supreme Court affirmed on June 12, 2014. *See* Order of Affirmance, Exhibit 57 (ECF No. 27-17).

This Court received Silva's federal habeas petition, initiating this action *pro se*, on July 2, 2014 (ECF No. 8). The Court granted Silva's motion for appointment of counsel, and appointed counsel to represent him. *See* Order entered October 6, 2014 (ECF No. 7). With counsel, Silva filed an amended habeas petition (ECF No. 19) on June 24, 2015.

On October 14, 2015, respondents filed a motion to dismiss, arguing that certain of Silva's claims are unexhausted in state court. *See* Motion to Dismiss (ECF No. 34). The Court denied that motion. *See* Order entered May 6, 2016 (ECF No. 39).

Respondents then filed an answer, responding to all of Silva's claims (ECF No. 49), and Silva filed a reply (ECF No. 56).

Discussion

Standard of Review

28 U.S.C. § 2254(d) sets forth the standard of review applicable in this case under the Antiterrorism and Effective Death Penalty Act (AEDPA):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing standard as "a difficult to meet" and "highly deferential standard for evaluating state-court rulings,

9

which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

Grounds 1 and 3c

In Ground 1, Silva claims that his federal constitutional rights were violated because the trial court did not grant his request for a continuance after one of his two attorneys was arrested during his trial. *See* Amended Petition (ECF No. 19), pp. 13-16. And, in Ground 3c, Silva claims that he received ineffective assistance of trial counsel, in violation of his federal constitutional rights, because of the arrest of one of his attorneys. *See id.* at 21.

On his direct appeal, Silva asserted a claim, that his federal constitutional rights were violated as a result of the trial court's refusal to grant a continuance after one of his two attorneys was arrested during trial. *See* Appellant's Opening Brief, Exhibit 34, pp. 8-10 (ECF No. 24-9, pp. 9-11). The Nevada Supreme Court denied that claim, ruling as follows:

> [...] Silva claims that the district court erred when it denied his request to adjourn trial for the balance of the day after one of his attorneys was arrested. Silva's principal counsel -- who remained free -- was Silva's attorney for his first trial on these charges, which ended in mistrial at closing arguments. Silva contends that by not allowing the continuance, the district court forced his attorney to choose between getting co-counsel out of jail and preparing Silva to testify, thereby infringing upon his Sixth Amendment rights. Those rights are indeed harmed when the district court orders certain restrictions on a criminal defendant's access to his or her attorney. *See, e.g., U.S. v. Sandoval-Mendoza*, 472 F.3d 645, 651 (9th Cir. 2006) (barring attorney-client discussion overnight prohibited); *U.S. v. Cobb*, 905 F.2d 784, 792 (4th Cir. 1990) (barring weekend discussion of cross-examination testimony prohibited). Here, however, the district court gave no such order, and we see no abuse of discretion in refusing the continuance. *See Rose v. State*, 123 Nev. 194, 206, 163 P.3d 408, 416 (2007).

Order of Affirmance, Exhibit 37, pp. 1-2 (ECF No. 25-2, pp. 2-3).

Also, in his state-court habeas action, Silva asserted a claim that he received ineffective assistance of counsel because of the arrest of one of his attorneys during his trial. *See* Petition for Writ of Habeas Corpus, Exhibit 39, pp. 19, 21 (ECF No. 26-1, pp. 5, 7). The state district court denied that claim, and the Nevada Supreme Court affirmed that ruling without any discussion

specific to it. *See* Findings of Fact, Conclusions of Law and Order, Exhibit 51 (ECF No. 27-11); Order of Affirmance, Exhibit 57 (ECF No. 27-17).

The Nevada Supreme Court's denial of these claims was reasonable. Silva had two attorneys representing him at trial. One of his attorneys, his second-chair trial counsel, was arrested (apparently on an outstanding warrant for failure to pay misdemeanor traffic tickets), and missed part of the trial as a result. Silva's lead trial counsel carried on without his co-counsel. Silva makes no claim that he had a constitutional right to have two attorneys represent him at trial. And, Silva makes no showing that the arrest of one of his two attorneys, which forced the arrested attorney to miss part of his trial, violated his constitutional right to counsel. The trial court's denial of a continuance for the afternoon after the attorney was arrested during the lunch recess was not so unreasonable and arbitrary as to violate Silva's constitutional rights. *See* Trial Transcript, January 6, 2009, Exhibit 21, pp. 55-58 (ECF No. 23-1, pp. 16-17); *see also Ungar v. Sarafite*, 376 U.S. 575, 589-90 (1964); *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983); *Houston v. Schomig*, 533 F.3d 1076, 1079 (9th Cir. 2008). The denial of the continuance did not preclude Silva's lead trial counsel from meeting with him to prepare for the next day of trial. *See Geders v. United States*, 425 U.S. 80, 86-91 (1976). Silva's lead counsel had defended Silva's case at trial before -- when Silva was tried the first time -- so he was unusually well-prepared for the second trial. Silva's constitutional right to counsel was not violated.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two prong test for analysis of claims of ineffective assistance of counsel: the petitioner must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. A court considering a claim of ineffective assistance of counsel must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. The petitioner's

burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state court has adjudicated a claim of ineffective assistance of counsel, under *Strickland*, establishing that the decision was unreasonable under AEDPA is especially difficult. *See Richter*, 562 U.S. at 104-05. In *Richter*, the Supreme Court instructed:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, [*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 994-95 (9th Cir. 2010) (acknowledging double deference required to state court adjudications of *Strickland* claims).

Silva makes no showing that the arrest of his second-chair trial counsel led to any unreasonable performance on the part of his counsel, and he makes no showing that he was prejudiced as a result of the arrest of his second-chair trial counsel. Silva's second-chair counsel did not take an active part in the trial. Silva's lead counsel questioned witnesses, made objections, and made the opening statement and closing arguments to the jury; second-chair counsel's role was essentially to assist lead counsel. *See* Trial Transcript, January 6, 2009, Exhibit 21, pp. 55-58 (ECF No. 23-1, pp. 16-17). Moreover, again, lead counsel was especially well prepared to represent Silva at trial, because he had defended Silva at his first trial. Silva simply cannot show that his counsel performed unreasonably or that there is a reasonable probability that, but for his second counsel's arrest, the result of the trial would have been different.

The Nevada Supreme Court's denial of relief on these claims was not contrary to, or an unreasonable application of, *Strickland*, *Ungar*, *Slappy*, or any other Supreme Court precedent. The Court will deny Silva habeas corpus relief with respect to Grounds 1 and 3c.

Grounds 2 and 3d

In Ground 2, Silva claims that his federal constitutional rights were violated by the admission into evidence of a letter allegedly written by Silva. *See* Amended Petition, pp. 16-17. In Ground 3d, Silva claims that he received ineffective assistance of appellate counsel, in violation of his federal constitutional rights, because his appellate counsel failed to assert on appeal that the introduction of the letter violated his federal constitutional right to due process of law. *Id.* at 21. The letter at issue is a letter that Silva allegedly wrote and sent to Jorge, asking that he and his family not to testify at trial.

On his direct appeal, Silva asserted a claim that the trial court erred in admitting the letter into evidence. *See* Appellant's Opening Brief, Exhibit 34, pp. 10-11 (ECF No. 24-9, pp. 11-12). The Nevada Supreme Court denied that claim, ruling as follows:

> Silva next contends that the district court erred in admitting a letter that he denied writing and in permitting the jury to consider the letter without expert testimony. As to the latter claim, Silva failed to raise this issue below, and, because expert testimony is not required to authenticate such evidence, *see* NRS 52.035, we conclude that none of Silva's "substantial rights" were affected. *See Gallego v. State*, 117 Nev. 348, 365, 23 P.3d 227, 239 (2001); *see also* NRS 178.602. Similarly, although Silva asserts that he did not write the letter -- and, in fact, repeatedly claimed that he is illiterate -- his brother-in-law testified that he recognized the handwriting in the letter as Silva's. NRS 52.035 permits the jury to consider such evidence and the district court was therefore not "manifestly wrong" in admitting it. *Colon v. State*, 113 Nev. 484, 491, 938 P.2d 714, 719 (1997).

Order of Affirmance, Exhibit 37, p. 2 (ECF No. 25-2, p. 3).

In his state-court habeas action, Silva asserted the claim that he received ineffective assistance of appellate counsel because counsel did not claim on his appeal that his constitutional right to due process of law was violated by admission of the letter. *See* Petition for Writ of Habeas Corpus, Exhibit 39, pp. 20, 42 (ECF No. 26-1, p. 6, and ECF No. 26-2, p. 10). The state district court denied relief on this claim, and the Nevada Supreme Court affirmed, without discussing the

13

claim. *See* Findings of Fact, Conclusions of Law and Order, Exhibit 51 (ECF No. 27-11); Order of Affirmance, Exhibit 57 (ECF No. 27-17).

State-court evidence rulings are not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by the due process clause of the federal constitution. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986). The Nevada Supreme Court's ruling that the letter was admissible as evidence under Nevada law is authoritative and beyond the scope of the Court's review in this federal habeas corpus action.

The federal due process inquiry is whether the admission of the evidence was so arbitrary or prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990. A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005). Silva does not allege facts approaching the standard for a due process violation. The admission of the letter into evidence was not arbitrary, and was not so unfairly prejudicial as to render Silva's trial fundamentally unfair.

With respect to Silva's claim that his appellate counsel was ineffective for failing to assert on appeal that the introduction of the letter into evidence violated his federal constitutional right to due process of law, Silva's appellate counsel did not act unreasonably in not asserting such a meritless claim, and Silva was not prejudiced by his appellate counsel not asserting that claim.

The Nevada Supreme Court's denial of relief on these claims was not contrary to, or an unreasonable application of, *Strickland*, or any other Supreme Court precedent. The Court will deny Silva habeas corpus relief with respect to Grounds 2 and 3d.

Ground 3a

In Ground 3a, Silva claims that his trial counsel was ineffective for failing to conduct sufficient pretrial investigation. *See* Amended Petition, pp. 19-20.

In his state-court habeas action, Silva claimed that he received ineffective assistance of counsel because his trial counsel failed to conduct a meaningful investigation. *See* Petition for Writ of Habeas Corpus, Exhibit 39, pp. 19-24, 42 (ECF No. 26-1, pp. 5-10, and ECF No. 26-2, p. 10); Supplement to Petition for Writ of Habeas Corpus, Exhibit 46, pp. 2-3 (ECF No. 27-6, pp. 3-4). The state district court denied that claim, and the Nevada Supreme Court affirmed. *See* Order of Affirmance, Exhibit 57 (ECF No. 27-17). The Nevada Supreme Court discussed one aspect of Silva's claim that his counsel did not sufficiently investigate his case before trial:

> [...] [A]ppellant argues that his trial counsel was ineffective for failing to investigate and present evidence that the victim and her family fabricated the allegations out of concern that appellant would move from the family home, bringing his wife and children with him. Appellant fails to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. Counsel challenged the victim's version of events on cross-examination. Counsel also questioned the victim's mother regarding her concerns that appellant would leave with his wife, who was also the victim's sister, and their children. In addition, appellant testified at trial and had the opportunity to inform the jury of these issues. Appellant fails to demonstrate a reasonable probability of a different outcome at trial had counsel investigated this issue as he did not demonstrate that there was evidence counsel could have discovered to support this claim. *See Molina v. State*, 120 Nev. 185, 192, 87 P.3d 533, 538 (2004). Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.

*Id.* at 2 (ECF No. 27-27, p. 3).

Silva asserts, in his amended petition in this case, that his trial counsel failed to sufficiently investigate: his claim that the victim and her family fabricated the criminal allegations against him out of concern that he would move away from the family home, and take his wife and child with him; his claim that AS had previously made unfounded allegations that her uncle had attempted to sexually abuse her; his claim that when searching for his cell phone on the night in question, Silva called his cell phone from the house land line. *See* Amended Petition, pp. 19-20. However, Silva does not specify what exculpatory information could have been discovered by means of further investigation. And, Silva does not proffer any information discovered through further investigation since his trial. Silva does not show that his trial counsel performed unreasonably with respect to the investigation, or that Silva was prejudiced by any shortcoming of counsel's investigation.

15

1   The Nevada Supreme Court's denial of relief on this claim was not contrary to, or an
2   unreasonable application of, *Strickland*, or any other Supreme Court precedent. The Court will deny
3   Silva habeas corpus relief with respect to Ground 3a.

4   Grounds 3b and 3e

5   In Ground 3b, Silva claims that his trial counsel was ineffective for failing to move for a
6   directed verdict regarding the sexual assault charge. *See* Amended Petition, p. 20. In Ground 3e,
7   Silva claims that he received ineffective assistance of appellate counsel, because his appellate
8   counsel failed to assert on appeal that the State presented insufficient evidence to support the sexual
9   assault conviction. *Id.* at 21-22.

10  In his state-court habeas action, Silva asserted a claim that there was insufficient evidence
11  presented at trial to support the sexual assault conviction. *See* Petition for Writ of Habeas Corpus,
12  Exhibit 39, pp. 9-13 (ECF No. 26, pp. 10-14). In that action, he also asserted a claim that his trial
13  counsel was ineffective for failing to move for a directed verdict on the sexual assault charge. *See*
14  *id.* at 19, 23-24 (ECF No. 26-1, pp. 5, 9-10). The state district court denied those claims, and, on
15  appeal, the Nevada Supreme Court, affirmed, ruling as follows:

> [...] [A]ppellant argues that his trial counsel was ineffective for failing to fully challenge the charges against him, as appellant asserts that the evidence was insufficient to prove sexual assault because there was no physical evidence of sexual activity and the only evidence came from the testimony of the victim. Appellant fails to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. We have repeatedly held that the uncorroborated testimony of a victim is sufficient to uphold a conviction for sexual asault when the victim testifies with some particularity regarding the incident. *See Mejia v. State*, 122 Nev. 487, 493 & n.15, 134 P.3d 722, 725 & n.15 (2006); *Gaxiola v. State*, 121 Nev. 638, 648, 119 P.3d 1225, 1232 (2005); *State v. Gomes*, 112 Nev. 1473, 1481, 930 P.2d 701, 706 (1996). Here, the victim testified that appellant touched her inappropriately on multiple occasions and had also forced her to have sexual intercourse. In addition, the victim's brother witnessed appellant in bed with the 12-year-old victim. Appellant fails to demonstrate a reasonable probability of a different outcome had counsel argued that there was insufficient evidence to support the charges. Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.

25  Order of Affirmance, Exhibit 57, pp. 2-3 (ECF No. 27-17, pp. 3-4).

26

1    There was sufficient evidence presented at trial to support Silva's sexual assault conviction.
2 *See, e.g.*, Testimony of AS, Trial Transcript, January 5, 2009, Exhibit 20, pp. 53-54 (ECF No. 23,
3 pp. 15-16) ("... [H]e put his penis in my vagina."); *id.* at 54-55 ("Five times in the past he touched
4 my vagina with his penis...."); Testimony of Toni Drew, Trial Transcript, January 6, 2009, Exhibit
5 21, pp. 72-73 (ECF No. 23-1, p. 20) (Drew testified that AS "was asked what she called a man's
6 private part and she told us that she called it his dick and that it had touched her private area, and
7 indicated pointing to her vaginal area.... She said it hurt."); Testimony of Neha Mehta, Trial
8 Transcript, January 6, 2009, Exhibit 21, p. 92 (ECF No. 23-1, p. 25) (Dr. Mehta testified that AS told
9 her "with regard to her front genital area, what she called her pussy, that the person had put his dick
10 in that location, and that it had felt hard, and that it had been painful."); Testimony of Carlos Luna,
11 Trial Transcript, January 6, 2009, Exhibit 21, pp. 109-10 (ECF No. 23-1, pp. 29-30) (Officer Luna
12 testified that AS told him "he has, you know, had sex with me prior, before. So I'm like, oh, really,
13 and then I said -- I didn't ask her how many times, but she said she had had previous intercourse with
14 him before."); Testimony of Vicente Ramirez, Trial Transcript, January 6, 2009, Exhibit 21, p. 129
15 (ECF No. 23-1, p. 34) (Detective Ramirez testified that AS told him "about an incident that
16 happened about a year and a half ago that he had forced her to have sex with him.").
17    It is plain that either a motion for directed verdict at trial, or a claim on Silva's direct appeal,
18 challenging the sufficiency of the evidence to support the sexual assault conviction, would have been
19 unavailing. Silva's counsel did not act unreasonably in not pursuing such challenges, and Silva was
20 not prejudiced by counsel's performance in that regard.
21    The Nevada Supreme Court's denial of relief on these claims was not contrary to, or an
22 unreasonable application of, *Strickland*, or any other Supreme Court precedent. The Court will deny
23 Silva habeas corpus relief with respect to Grounds 3b and 3e.
24 ///
25 ///
26 ///

Certificate of Appealability

The standard for issuance of a certificate of appealability calls for a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000). The Supreme Court further illuminated the standard in *Miller-El v. Cockrell*, 537 U.S. 322 (2003). The Court stated in that case:

> We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail. As we stated in *Slack*, "[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."

*Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484). The Court has considered all of Silva's claims with respect to whether they satisfy the standard for issuance of a certificate of appeal, and determine that none of them do. The Court will deny Silva a certificate of appealability.

///
///
///
///
///
///
///
///

**IT IS THEREFORE ORDERED** that, pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of the Court shall substitute Renee Baker for Robert LeGrand, on the docket for this case, as the respondent warden, and shall update the caption of the action to reflect this change.

**IT IS FURTHER ORDERED** that the Amended Petition for Writ of Habeas Corpus (ECF No. 19) is **DENIED**.

**IT IS FURTHER ORDERED** that petitioner is denied a certificate of appealability.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall **ENTER JUDGMENT ACCORDINGLY**.

Dated this 27 day of July, 2017.

_____
UNITED STATES DISTRICT JUDGE